Erica Giepen and Henry J. Roger v. Commissioner.
Giepen v. Commissioner
Docket Nos. 51268, 51269.
United States Tax Court
T.C. Memo 1957-6; 1957 Tax Ct. Memo LEXIS 246; 16 T.C.M. (CCH) 20; T.C.M. (RIA) 57006; January 15, 1957
*246 Issue 1. Upon the facts, held that: (1) Loans were made by a partnership, in which petitioners were equal partners, to a corporation in the total amount claimed. (2) The total debt due the partnership as a result of the loans was secured to the extent of the face amount of a mortgage, so that only part of the entire debt was unsecured. (3) The debt became partially worthless in the partnership's fiscal year, involved here, to the extent that the loans were unsecured. (4) The loans did not give rise to a business bad debt within section 23(k)(1), 1939 Code, and deduction of any amount is denied. (5) No issue was presented under the pleadings, or in the deficiency notice, involving a claim for a nonbusiness bad debt under section 23(k)(4), and such issue, therefore, cannot be considered. Issue 2. Upon the facts, held that petitioner, Henry J. Roger, has failed to establish that there is available for carry-back to 1947, all or part of a net operating loss sustained in 1948, for the purpose of a net operating loss deduction under section 23(s). Issue 3. Partnership reduced its gross receipts by $6,200 representing a "Reserve for Sales Refunds." Held, that there were no fixed and definite *247 liabilities in this amount and that the partnership is not entitled to a reserve for future contingent claims. Held, further, that such "reserve" represents a change in the partnership's method of accounting without obtaining the Commissioner's permission to make such change. Issue 4. In this proceeding, claim is made for reduction of partnership's gross profit in amount of $6,679.05, representing receipts for sales where deliveries to donees of partnership's vendees were not completed. Held, that receipts for sales must be included in income in fiscal year in which received. North American Oil Consolidated v. Burnet, 286 U.S. 417. Held, further, that the claimed reduction of gross profit in such amount, on account of sales where delivery had not been completed, represents a change in the partnership's method of accounting without obtaining the Commissioner's permission. Irving D. Isko, Esq., for the petitioners. Robert J. Cowan, Esq., and A. Jesse Duke Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for the calendar year 1947 as follows: Docket No. 51268
Erica Giepen
$1,524.77
Docket No. 51269
Henry J. Roger
1,442.15
*248 In each proceeding the Commissioner made the following determination: "It is held that your distributive share, representing one-half of the partnership net income of International Gift Parcel Service for the fiscal year ended June 30, 1947 has been understated in the amount of $5,035.00. The deductions of the partnership of a reserve for sales refund of $6,200.00 and bad debts in the sum of $3,870.00 [$10,070] are held not to be allowable under the provisions of the Internal Revenue Code." In Docket No. 51269, Henry J. Roger, an additional determination was made; the Commissioner held that a deduction claimed as a net operating loss carry-back to 1947, allegedly attributable to a net operating loss in 1948, is not allowable under the provisions of subsections 4 and 5 of section 122(d), 1939 Code. The alleged net operating loss carry-back deduction was disallowed in connection with the Commissioner's rejection of a claim for refund of tax made by Henry J. Roger. An issue is raised by petitioners in their respective petitions for the first time. Petitioners claim that the gross receipts and gross profit of their partnership, International Gift Parcel Service, for its fiscal year ended *249 June 30, 1947, should be reduced to eliminate transactions entered into during the last ten weeks of the fiscal year because such transactions involved shipments made for customers which had not been received by donees of the customers before the end of the fiscal year. Under this issue, petitioners contend that the partnership's gross profit for the fiscal year involved should be reduced by $6,679.05. Petitioners claim that tax for the calendar year 1947 has been overpaid. The issues are: (1) Whether the partnership, International Gift Service, had a business debt, in the amount of $3,870, which became worthless during its fiscal year ended June 30, 1947, so as to be entitled to a bad debt deduction under section 23(k), 1939 Code. (2) Whether the petitioner, Henry J. Roger, is entitled to deduction in 1947, under section 122(d), 1939 Code, of a net operating loss carry-back from 1948. (3) Whether the partnership, for its fiscal year, is entitled to deduction of $6,200 for a so-called "reserve for sales refunds." (4) Whether the partnership income for its fiscal year should be reduced by the amount of $6,679.05. Findings of Fact General Facts: - Each petitioner, Erica Giepen and Henry *250 J. Roger, filed individual returns with the collector of internal revenue for the third district of New York. International Gift Parcel Service, a partnership, filed a partnership return (form 1065) for the fiscal year ended June 30, 1947 with the collector of internal revenue for the third district of New York. Erica Giepen (hereinafter called Erica) was a resident of New York City in 1947. She reported her income on a cash basis and for a calendar year. She was born in Germany. In 1933, she was married to Hubert Giepen (hereinafter called Hubert, or Giepen.) One child, born of this marriage, was living in 1947. Erica and Giepen separated in 1945, but they were on friendly terms. They were divorced in 1953 or 1954. Henry J. Roger (hereinafter called Roger) was a resident of New York City in 1947. He reported income on a cash basis and for a calendar year. He was born in Berlin, Germany, in 1913. At some time prior to 1947 he married. In his return for 1947 he claimed exemptions for his wife and one child. Roger left Germany as a refugee in 1933, when he went to France. He came to the United States in 1939. His education took him through high school. On or about July 1, 1945, Roger *251 and Erica formed a partnership in New York for the purpose of carrying on a business under the name, International Gift Parcel Service. International Gift Parcel Service is referred to hereinafter as International, or as the partnership. They were equal partners, each having a 50 per cent interest in the assets and earnings and losses thereof. The partnership kept its books and reported income in its partnership return on the basis of a fiscal year beginning on July first and ending on June thirtieth. In the partnership return for the fiscal year ended June 30, 1947 (hereinafter referred to as either the fiscal year involved, or the 1947 fiscal year), the business of the partnership was described as "Food, etc. to foreign countries"; and the method on which the return was prepared was stated to be "accrual basis." In reporting income, the partnership used inventories which were stated in the return to be valued at "cost or market." The nature of the business of the partnership, the type of accounting records kept for the partnership, and the basis on which accounts were kept and income was reported are dealt with hereinafter. Rogers ceased to participate actively in the operations *252 of the partnership business on June 30, 1948. The partnership was dissolved as of January 31, 1949, when Roger withdrew his remaining interest. Max Kochman is a certified public accountant licensed in New York. He was the accountant of the partnership from the beginning until the end of its existence. Kochman studied accounting and law in Germany. He became a certified public accountant in Germany in 1933, and in New York in 1942. He came to the United States in 1937. During 1947, International had a place of business, a store, at 654 Amsterdam Avenue, New York City. International's business was, in 1947 and before, the selling of parcels of foodstuffs such as flour, bread, candy, coffee, chocolate, powdered milk, lard, butter, and pepper. Orders were received from individuals in New York City, and other places, in the United States who wanted to send parcels of food to persons located in various localities in Europe. International kept on hand, in its store, stocks of foodstuffs to be packed in parcels according to orders. International undertook to send parcels of food to donees in Europe, or to make arrangements for forwarding parcels of food to such donees. In its fiscal year *253 1947, and before, the partnership did not sell clothing, or buy clothing for resale. It sometimes received clothing from a customer in the United States for forwarding to an addressee in Europe. In 1947, and before, individuals in Europe were in need. There existed difficulties in sending and delivering packages and mail to people located in East Germany, Bulgaria, Greece, and other localities other than in England, France, and Italy. International made public offers to send and to obtain deliveries of packages of foodstuffs to individuals located in localities to which delivery service was not normal. There are set forth hereinafter additional facts about the operation of International's business. Issue 1: - Alleged Worthless Debt of Idlewild. A deduction in the amount of $3,870 was taken in the partnership return of International for its fiscal year ended June 30, 1947, for a worthless debt. The Commissioner disallowed the deduction in determining the shares of Erica and Roger, respectively, in the partnership net income. Idlewild Manufacturing Corporation (hereinafter called Idlewild) was, in 1946, engaged in a business of stamping sheet metal from which boxes, copper dishes, and *254 other metal wares were made. Idlewild had a plant which was located somewhere on Long Island. It owned various assets including machinery. Its stock was owned in equal amounts by Hubert Giepen, who was president, and Charles Heidenreich, secretary, who was in charge of production. Idlewild had a bookkeeper; Heidenreich had nothing to do with the corporation's books and he was not acquainted with entries therein. Roger was acquainted with Giepen and knew something about Idlewild's operations. In 1946, Hubert Giepen, as president of Idlewild, made a proposition to Roger, as a partner in International, which was, in general, that Idlewild would enter into a new business activity of buying used clothing, of repairing, cleaning, and packaging such articles of clothing, and of selling packages of reconditioned clothing to International for resale to its customers. The gist of the proposal was that International would add packages of reconditioned clothing to the merchandise it sold to people who wanted to send goods abroad to needy people; that Idlewild would buy articles of clothing and do all the work required to condition them and package them; and that International's payments to Idlewild *255 would cover Idlewild's costs and yield it some profit. Giepen told Roger that he had no funds with which to undertake such new activities, not did Idlewild. Roger consulted Erica. He also discussed the plan with Heidenreich to get his cooperation. International had received packages of clothing for its customers and had sent the packages abroad to the customers' addressees. Some concerns in New York City, in the operation of their businesses sold used clothing for shipment to needy people in Europe. Roger and Erica believed that the sale of reconditioned clothing would be a profitable undertaking on the basis of Giepen's proposition to acquire and recondition used clothing. Accordingly, after various discussions an oral agreement was made at the end of 1946 by Roger, for International, and by Giepen, for Idlewild, to the effect that Idlewild would acquire necessary machinery for cleaning and repairing clothing for sale in packages to International, and International would loan funds to Idlewild to enable it to acquire machinery and handle used clothing. Beginning with a loan on December 31, 1946, International made several advances to Idlewild. Idlewild did not give any notes for *256 the advances, however, and no interest was paid. Between December 31, 1946 and April 30, 1947, International loaned Idlewild $9,320. The loans were made by checks of International. International's books included a general journal and a general ledger. In the ledger were separate drawing accounts of Roger and of Erica, and an account called Loans & Exchanges. Of the total advanced to Idlewild, $2,170 was debited to Loans & Exchanges, and $7,150 was debited in equal amounts to the respective drawing accounts of Erica and Roger, i.e., $3,575, to each. Idlewild did not commence operations on used clothing as soon as Roger and Erica expected, and so late in the spring of 1947, Roger made inquiries of Giepen and learned that Idlewild's metal stamping business had declined and that Idlewild was unable to repay a bank in Far Rockaway. Long Island, loans aggregating $5,000 which had became due. Roger then asked Giepen for some security for the loans which had been made by International to Idlewild. Giepen "pledged" his deed, in his name, to a house he owned in Far Rockaway. That is to say, he delivered his deed to Roger. Thereafter, when Idlewild delayed further commencing used clothing reconditioning, *257 Roger again inquired about Idlewild's financial condition and found that it had become worse and that Giepen had not used the money loaned by International to Idlewild to purchase equipment for cleaning and repairing secondhand clothes. Roger and Erica then asked Giepen for better security than the pledge of the deed to Giepen's house. At some time before June 30, 1947, Giepen gave Erica a second mortgage in the amount of $8,000. The mortgage was made to Erica and was recorded. Idlewild did not acquire at any time equipment to recondition secondhand clothing, and it did not carry out its agreement to acquire, process, package, and sell clothing to International. In the late spring of 1947, Idlewild laid off all of its employees in its metal stamping business, and during the summer of 1947 Heidenreich, alone, worked in Idlewild's plant making wares to pay some of Idlewild's debts. Also, it was unable to pay debts to others and had to give a mortgage on its machinery. In June 1947, Roger and Erica concluded that Idlewild was unable to repay any of the $9,320 which it had received from International. Idlewild never repaid any part of the loans. Idlewild was insolvent before June 30, 1947. *258 As the end of the 1947 fiscal year of International approached, Erica and Roger discussed their problem of the loans to Idlewild with their accountant, Kochman, and told him of Idlewild's failure to comply with its agreement. He made several adjusting entries on the books of International on June 30, 1947 in the general journal and general ledger. By these adjusting entries, Kochman treated the total amount of the loans, $9,320, as secured by the mortgage of $8,000 to the extent of only $5,450, and the balance, $3,870, as a worthless debt. Since the mortgage for $8,000 was made to Erica, rather than to Erica and Roger, or to International, he transferred some of the debits which had been made to the drawing account of Roger, to Erica's drawing account so that her drawing account would reflect loans of $5,450. The several adjusting entries on the general journal and ledger of International were as follows: On June 30, 1947, an account receivable in the name, "Idlewild", and an account entitled "Bad Debts" were entered in the general ledger. On June 30, 1947, the account, Loans & Exchanges, was credited $2,170; the drawing account of Roger was credited $1,700; and the account receivable, *259 "Idlewild," was debited $3,870, which is the total of the above credits. In the general journal the explanation for the credits and the debit is as follows: "To record loans to Idlewild on separate account." Also, on June 30, 1947, $3,870 was credited to the account receivable, "Idlewild," and was debited to the account, "Bad Debts." Also, on June 30, 1947, a credit of $3,870 was entered in the account, Bad Debts, which closed the account to Profit and Loss. Also, on June 30, 1947, the sum, $1,875 was credited to the drawing account of Roger and the same amount was debited to the drawing account of Erica. These entries were described as a transfer of drawing from Roger to Erica. The two credits to the drawing account of Roger, i.e., $1,700 and $1,875, total $3,575, was the total of the charges to the drawing account of Roger, set forth above, for loans to Idlewild. Since Erica's drawing account had been charged $3,575 for loans to Idlewild, the debit of $1,875, on June 30, 1947, to the drawing account of Erica increased the charges to her drawing account to $5,450. In other words, the entries on June 30, 1947, had the effect of transferring from Roger's drawing account to Erica's drawing *260 account, part of the debits for loans to Idlewild for which the mortgage constituted security, the mortgage being in her name, and had the effect, also, of transferring from Roger's drawing account and from Loans & Exchanges to an account in the name of Idlewild, the part of the debits for the loans to Idlewild for which it is alleged there was no security, namely, $3,870. Neither Erica nor Roger made personal loans to Idlewild. All of the loans, in the total amount of $9,320, to Idlewild were made by International. The loans were not proximately and directly related to International's business of selling commodities to people who desired to send packages to needy people outside the United States. The total debt of Idlewild to International was partially worthless before the end of the fiscal year ended June 30, 1947, to the extent of $1,320, and this amount was charged off as a bad debt on International's books at the close of the fiscal year. Giepen's house in Far Rockaway was sold in 1948. Out of the proceeds of the sale, $8,000 was paid to Erica in satisfaction of the mortgage which she held, and $8,000 thereof was received by International in payment of loans in that amount to *261 Idlewild. Issue 2: Claim of Roger for loss carryback to 1947. In his income tax return for 1947, Roger did not take a deduction for a net operating loss carry-back. In his petition in this proceeding, he made claim for the first time for a loss carry-back to 1947 from 1948. There is no evidence that Roger took a deduction in his 1946 return for any net operating loss carry-back from 1948; nor is there any evidence as to his gross or net income for 1946. Separate and apart from advances that International made to Idlewild, there was a transaction between Roger and Giepen which related to an indebtedness of Idlewild to the bank in Far Rockaway, Long Island. Sometime prior to March 1947, when a note of Idlewild became due, Idlewild was unable to make payment and Giepen asked the bank for an extension of time in which to pay the note and for a further loan. The original loan was for $3,000; the additional loan requested was for $2,000. Before granting the extension and further loan, the bank required a guarantor of Idlewild's new note. Giepen called upon Roger to give this accommodation and Roger endorsed a new note in the amount of $5,000, as guarantor. In March of 1947, the bank notified *262 Roger that the note had been defaulted. The note was never paid by Idlewild and sometime after March 1947, the bank instituted suit on the endorsement against Roger. In October of 1947, while this suit was pending, Giepen gave Roger a deed to his residence in Far Rockaway, Long Island, Idlewild then being insolvent. The house had a fair market value at that time of $13,500. It was encumbered with two mortgages. The amount of the first mortgage is unknown. The second mortgage, held by Erica, was in the amount of $8,000. In his 1947 and 1948 returns, Roger indicated that the basis for depreciation of the property was $9,500. In his 1948 return, Roger indicated that the cost of the property for purposes of computing his net operating loss was $14,560.21. In June 1948, Roger sold the premises for $13,500. Some time after this, Roger settled his liability on the note. Roger's income tax return for 1948 contains the following: Distributive share of International's
profit
$1,030.05
Loss in operation of boarding house
in Pennsylvania
( 461.50)
Business loss on Idlewild advances
(personal)
( 3,636.66)
Gross income
($3,068.11) Roger is not entitled to any net operating loss carry-back to the year 1947. *263 Issues 3 and 4: Claims for reductions in gross receipts of International. In the partnership return of International for its fiscal year ending in 1947, actual gross receipts were not reported; rather, an amount reduced by $6,200 was reported as gross receipts. In their petitioners, petitioners claimed, for the first time, that International's gross profits should be reduced further by the amount of $6,679.05, but for reasons other than relate to the first stated amount, $6,200. International kept its records of sales of merchandise on a cash basis, and of purchases of merchandise on a cash basis. The accounting records of International consisted of order books, a cash book, and a general journal and a general ledger. All sales were paid for by customers at the time of sale. As sales were made and money received, they were recorded in the order books and receipts therefor were given to the customers. The total of all sales in each order book was entered by Erica in the cash book, in a column headed sales. The cash book was a small bound volume containing a record of receipts and disbursements. International's accountant made no entries in the cash book, but, he reconciled it with *264 bank balances, and he posted the results into the general ledger. The general ledger and general journal were kept in another small bound volume. Entries in this book were made exclusively by the accountant. The accountant worked on the books once every two or three months. International's business was done strictly on a cash basis. It had four employees other than petitioners who accepted and filed orders. Some orders were placed by customers in person at International's place of business; other orders were made by letters and telephone. Parcels were paid for when the order was taken. Telephone and mail orders were accepted but were not filled until the sales price was received. All cash received was deposited in International's bank account with the exception of a small amount which was kept on hand to make change for customers. Sales were recorded on a cash basis, being entered on the books when cash was received. Merchandise purchases were also recorded on a cash basis being entered on the books only when bills were paid. Merchandise was kept on the premises with which to fill orders. An inventory of merchandise on hand was kept. There was a large turnover of merchandise, so that *265 inventory of merchandise on hand at the end of a fiscal year constituted a small proportion of the total merchandise sold during the year. For example, the opening inventory on July 1, 1946, amounted to $1,005, and the closing inventory on June 30, 1947, amounted to $1,500, whereas $99,878.65 of merchandise was purchased during the fiscal year. The books of International did not contain any account for purchases of customers which had been forwarded to donees of customers and which, as of the close of a fiscal year, had not been received by such donees. International placed advertisements of its business and service in German language newspapers in New York City. The advertisements set forth International's firm name and address, some description of the food packages and the prices thereof which were for sale, and the localities to which International would forward, for its vendees, such food packages. In the advertisements there appeared German words meaning that International's charges included insurance, wrapping, and a charge for forwarding or shipping. One of the words which appeared is "versicherung, " which means, at least, insurance, but the parties are not agreed upon the *266 entire meaning of this word. In addition to these advertisements, form letters were sent to former customers listing the contents and prices of five specific parcels. Two examples of these are: Parcel 1100 - Price $3.00. 1 lb. roasted coffee (beans), 1 lb. pure lard, 1 lb. beef meat, 2 Maggi meat sauces, 1 lb. rice, 2 bars milk chocolate (8 oz.) Parcel 1500 - Price $7.00. 1 tin Martinson's coffee, 1/4 lb. tea (orange pekoe), 1 quart vegetable oil or 1 lb. butter (best creamery, tin), 12 oz. bacon, 1 tin tuna fish (7 oz.), 1 lb. rice, 1 lb. orange marmalade, 3 boxes assorted spices, 10 Maggi cubes, 2 bars milk chocolate (8 oz.), 1/2 lb. Charms candies, 2 Ivory soaps. The form letters contained this sentence, "All parcels are guaranteed to arrive or parcels will be cheerfully replaced or refunded in case of loss or theft." International's employees were instructed to inform customers that if delivery to the vendee's donee overseas was not completed, their money would be refunded or duplicate shipments made. However, there was no written contract to this effect with customers. The forwarding by International of food packages purchased and paid for by customers in New York was a service *267 of International, which was an essential part of its business. However, the use of the parcel post service was limited to shipments to certain countries in western Europe, such as England, and France, and a few other countries. In order to arrange for deliveries to persons located in countries in eastern Europe, such as East Germany, Yugoslavia, Hungary, and other countries in the Balkan area, where ordinary delivery services did not exist, International made use of some commercial forwarding agencies which represented that they had ways of making deliveries under the prevailing, difficult circumstances. One of such forwarding agencies, Hausman, was located in Zurich, Switzerland, and so International made some shipments of food packages to him. In such instances, International turned over packages to some firm in New York City which specialized in making overseas shipments, such as Endicott Express, which sent packages to ships at New York docks. Other agencies, besides Hausman, with which International dealt were Overseas and Safran, both of which were located in New York City. Hausman, Overseas, and Safran are sometimes referred to hereinafter as forwarders. International also *268 had some arrangement for purchasing food packages from "depots" in Europe, about which there is almost no evidence. In such instances, of course, the merchandise paid for in New York by a vendee of International was not merchandise in International's stock. No record was kept in International's books of its purchases abroad of food packages located in any European "depot." The record does not establish whether such purchases by International represented a small or a substantial part of International's sales and its gross receipts from its vendees. Parcels packed on International's premises were made up within two days after payment was received for an order. In those instances where parcels were sent by parcel post, the packages were taken from International's store to a post office every day; but where packages were sent overseas by a forwarder, they were accumulated and then taken to the commercial shipping agency in time to be delivered to a ship. Some deliveries were made to donees of International's vendees within from four to eight weeks, but International allowed ten weeks for deliveries and eight weeks more for its vendees' receipts of acknowledgments from their donees. For *269 some period, International had blanket insurance coverage for loss of goods in transit under a policy issued by Lloyd's in 1945. The policy was cancelled at some time after June 30, 1946. At some time, International made claims against Lloyd's under its insurance which were not approved, and International instituted a suit against Lloyd's which was settled out of court in 1950 for about $100. After this insurance was cancelled, International had no insurance against loss of merchandise in transit. International received some claims for nondelivery of packages from its vendees, from time to time. In many instances, International made reshipments, without charge, to satisfy such claims. In some instances, International made cash refunds to its vendees of the total amount paid. International, in some instances, accepted such claims on the basis of a letter from a donee of its vendee stating that there was no receipt of a package by the donee, if 18 weeks had elapsed from the time a package would have been started on its way to a donee. In International's books, entries were made for cash refunds to vendees for nondelivery of packages, which were charged to sales. There was no separate *270 account for refunds; such entries were made in the account where sales were recorded. In those instances where duplicate orders were made up and shipped without charge to replace lost or undelivered packages, no entries were made in the books to separate such uses of merchandise from regular cash sales, so that there is no record, and there is no proof, of the dollar amount of merchandise which, in any fiscal year, constituted replacements of undelivered or lost orders. Duplicate shipments were, therefore, only reflected in International's closing inventory. During its fiscal years ended June 30, 1946 and June 30, 1947, International made cash refunds to its vendees in the amounts of $49.16 and $3,858.83, respectively, which were recorded in its books as charges to sales. Gross sales for the fiscal year ended June 30, 1948, amounted to $149,446.42, and cash refunds amounted to $1,712.53. For the short fiscal year ended January 31, 1949, there were gross sales of $21,758.53 and cash refunds of $30.25. In other words, the partnership's gross sales and its actual cash refunds to its vendees during its fiscal years ended in 1946, 1947, 1948, and 1949, were as follows: Gross
Cash
Fiscal Year
Sales
Refunds
Ended 6/30/46
$ 50,905.41
$ 49.16
Ended 6/30/47
192,399.38
3,858.83
Ended 6/30/48
149,446.42
1,712.53
Ended 1/31/49
21,758.53
30.25
Total
$414,509.74
$5,650.77
Near *271 the end of the 1947 fiscal year, the accountant, Kochman, suggested that International set up on its books a new account that would reflect cash refunds to customers which might be made in the next year, or in future years. Under the date of June 30, 1947, $6,200 was charged to sales and credited to the new account called "Reserve for Sales Refunds." The amount, $6,200, which was charged to the new "Reserve" account, was an estimate. International did not report its gross income of $192,399.38 for the 1947 fiscal year in the partnership return. Instead, it reported, as its gross receipts a net amount, $182,340.55, which was computed in the following manner: Gross sales
$192,399.38
Less: Cash refunds made
during year
$ 3,858.83
Less: "Reserve for Sales
Refunds"
6,200.00
10,058.83
Total
$10,058.83
Net gross receipts
$182,340.55
In determining the deficiencies, the Commissioner increased International's gross sales by $6,200. Petitioners did not make any request of the Commissioner before June 30, 1947, or thereafter, for permission either to set up on the books an account for a so-called reserve for sales refunds, or an account for a so-called reserve for goods in transit, or to change the partnership's *272 method of accounting, and such permission never was granted. In the new so-called reserve for sales refunds account, which was put on the partnership's books on June 30, 1947, with an opening entry crediting the account with $6,200, the subsequent entries were as follows: During the fiscal year ended June 30, 1948, the "reserve" account was debited with $1,712.53 which represented cash refunds made in that fiscal year to customers, leaving a balance of $4,487.47 in the "reserve account." During the next fiscal period ended January 31, 1949, the account was not debited with $30.25, the amount of actual cash refunds. Rather, the sales account was debited $30.25, which entry represented a reversion to the method of accounting for cash refunds before the reserve account was set up on the books. There was no other credit to the so-called reserve account after the credit of $6,200 on June 30, 1947. That is to say, no credit was made during the fiscal year ended June 30, 1948, of any amount which would correspond to the credit of $6,200 made on June 30, 1947, so that the attempt to establish a "reserve" account for cash refunds to vendees was not, in practice, set up on an annual basis. On *273 January 31, 1949, a debit of $3,087.47 was made to the so-called reserve for sales refunds account, and correspondingly, income was credited $3,087.47. These entries served to transfer out of the "reserve" account back to income the sum, $3,087.47. Testimony was not adduced in explanation of these entries but other entries in the partnership's books indicate that the sum, $3,087.47 is the total of several items which may have been claims against the partnership which were abandoned by claimants. After the debit of $3,087.47, there remained a balance of $1,400 on January 31, 1949, in the so-called reserve account. The partnership business was terminated in January 31, 1949. Petitioners allege that the partnership, as of June 30, 1947, had claims against various forwarders of merchandise, sold by the partnership, having a value of $6,200. The record does not establish that such alleged claims of the partnership were legally enforceable claims. There is no evidence that the partnership ever instituted any legal action against anyone for such alleged claims. The record shows that the partnership did not collect any part of the alleged claims of $6,200. Opinion HARRON, Judge: Issue 1: *274 - Alleged Worthless Debt of Idlewild. Petitioners contend that the partnership, International, loaned Idlewild $9,320; that the indebtedness of Idlewild was partially worthless in the fiscal year ended June 30, 1947, to the extent of $3,870; and that the partially worthless debt is deductible in the full amount of $3,870, as a business bad debt under section 23(k)(1), 1939 Code. Under this issue there are several questions of fact with respect to which the petitioners have the burden of proof. Although the evidence relating to the amount, $9,320, of the loans to Idlewild is not entirely satisfactory, some doubts have been resolved in favor of the petitioners, giving their proof the consideration they seek, in view of some difficulties they encountered in preparing for trial as the result of destruction of some cancelled checks. Petitioners have relied upon entries in the partnership's books together with their own testimony. Considerable weight is given, in this instance, to some of the bookkeeping entries. It is concluded upon consideration of all of the record that loans totaling $9,320 were made by International to Idlewild. The first question to be considered is whether petitioners *275 have established by competent proof that the debt was partially worthless in the fiscal year ended June 30, 1947, to the extent of $3,870. As has been shown in the facts, the amount, $3,870, results from apportioning part of the security of $8,000, represented by the second mortgage on Giepen's house which was given to Erica, to an alleged personal debt of Giepen to Erica in the amount of $2,550. Petitioners argue that they agreed that the mortgage would be regarded by them as security to Erica for a debt of $2,550 owing to her, personally, from Giepen, leaving $5,450 of the mortgage as security for the partnership's loans of $9,320, so that the partnership's loans were unsecured to the extent of $3,870. We are unable to find as a fact, upon the evidence before us, that there was a legally enforceable debt of $2,550 owing by Giepen to Erica either at the time she received the $8,000 mortgage, or as of June 30, 1947. On this point, petitioners rely entirely upon Erica's testimony. That testimony is entirely self-serving; it is vague in most respects; and it is entirely uncorroborated. Erica testified, merely, in 1947, and before, she was separated from Giepen and that he owed her money *276 for the support of their child to the extent of $2,550. She gave no explanation of how she arrived at the above sum and there is no proof that Giepen was under a legal obligation to pay Erica, as of June 30, 1947, $2,550, or any lesser amount. Giepen was not called upon to give any testimony so that Erica's testimony on this point is not corroborated. The failure of petitioners to call Giepen as a witness leads to a presumption that if called, his testimony would have been adverse to petitioners' contention. Mammoth Oil Co. v. United States, 275 U.S. 13. It is concluded that all of the $8,000 mortgage secured the partnership's loans to Idlewild, and that the mortgage had a value of $8,000, lacking evidence to the contrary. Therefore, Idlewild's debt was unsecured to the extent of only $1,320. The value of the mortgage, the security, must be offset against the indebtedness before any deduction for a worthless, or for a partially worthless, debt can be allowed. Collin County National Bank v. Commissioner, 48 Fed. (2d) 207, affirming 14 B.T.A. 1256; Regulations 111, section 29.23(k)-1(6). It follows from the above conclusion that petitioners are limited, under this issue, to a claim *277 for a partially worthless debt deduction of only $1,320. Next, they must establish that the debt was partially worthless in the fiscal year ended in 1947 to the extent of $1,320. Upon all of the evidence, we are satisfied that Idlewild was insolvent as of June 30, 1947, and have so found. There are identifying events which established the insolvency, namely, the curtailment of Idlewild's metal stamping business by laying off all employees in the spring of 1947, and its default on a bank indebtedness. Petitioners' proof on this point is not entirely satisfactory, and some doubts, again, are resolved in their favor. We come, now, to the chief question which is whether there was a business bad debt of the partnership of $1,320 within the provisions of section 23(k)(1). Petitioners rely entirely upon the theory that there was a direct and proximate relation of the loans to Idlewild to International's business. The argument of petitioners is, briefly, that the sale of packages of clothing to vendees in New York who desired to have such packages forwarded to donees living abroad, was of the same nature as International's dealings in packages of food, and that the addition to International's *278 merchandise of parcels of clothing would have been a profitable enlargement of the business. With this part of the argument we are in accord. But, Idlewild was not engaged in a business of buying secondhand clothing and of the cleaning, repairing, and packaging thereof at the time any of the loans were made in 1946 and 1947. Furthermore, Idlewild did not succeed at any time in getting into that business and the evidence does not establish, upon due consideration of the entire record, that Idlewild made any sales in 1947, or any other year, of parcels of clothing to International. Accordingly, this case is distinguishable from Stuart Bart, 21 T.C. 880; and Tony Martin, 25 T.C. 94. Idlewild's only business in 1946 and 1947 was the metal stamping business. Loans to it to carry on that business, or to liquidate indebtedness incurred in that business had no relationship whatsoever to International's business. Of course, International clearly cannot be said to have carried on a business of promoting other business operations, or of loaning money. The facts do not bring this issue within the doctrine of Robert Cluett, 3rd, 8 T.C. 1178; Vincent C. Campbell, 11 T.C. 510; Henry E. Sage, 15 T.C. 299; *279 or even of Weldon D. Smith, 17 T.C. 135, reversed 203 Fed. (2d) 310. The record is not clear about what use Giepen made of all or part of the money loaned to Idlewild. Again it is noted, petitioners did not call upon him to testify. Mammoth Oil Co. v. United States, supra.The implication to be obtained from the record is that Giepen used all of the loans to take care of financial obligations incurred in Idlewild's metal stamping business. It must be concluded that he did not use any of the loans to get Idlewild started in a new business, the buying and reconditioning of used clothes, in the absence of proof to that effect. Petitioners appear to have been greatly misled by Giepen, and although such failure of Giepen to fulfill his promises resulted in substantial loss and detriment to petitioners, as the partners, in Idlewild, their mere intentions to and hopes of making loans which would be proximately and directly related to International's business cannot provide the basis for holding that the loans gave rise to a business bad debt. Deductions are a matter of legislative grace; statutory conditions and requirements must be met. The true facts control, here, not petitioners' *280 unfulfilled intentions, hopes, or expectations. It is held that the loans to Idlewild did not give rise to a business bad debt within section 23(k)(1). Under all of the facts and circumstances present here, the rationale of Dalton v. Bowers, 287 U.S. 404; Burnet v. Clark, 287 U.S. 410; W. A. Dallmeyer, 14 T.C. 1282; A. Kingsley Ferguson, 16 T.C. 1248; and Jan G. J. Boissevain, 17 T.C. 325, is controlling. At the most, petitioners might claim deduction for a nonbusiness bad debt under section 23(k)(4), but petitioners have not made an alternative claim for a deduction under section 23(k)(4), under which the loss would have to be treated as though it were a loss from the sale or exchange of a capital asset held for not more than 6 months. No issue having been raised by the pleadings involving section 23(k)(4), we cannot consider such issue. That issue was not tried. See Maltine Co., 5 T.C. 1265, 1275. For example, the record does not show whether petitioners have already claimed the maximum amount allowable as a net capital loss for their taxable years under section 117(d)(2), or whether, in any other respect, the provisions of section 117(d)(2) preclude allowance to petitioners *281 of a nonbusiness bad debt deduction for a bad debt loss of $1,320. It is held that respondent's disallowance of a bad debt deduction was correct; his determination is sustained. Issue 2: - Claim of Roger for Loss Carryback to 1947. In his petition, Roger has made claim for a net operating loss carry-back to 1947 from 1948. He contends that in 1948 he sustained a net operating loss in the amount of $3,068.11. Deduction for a net operating loss carry-back is claimed under section 23(s), computed under 122(b), 1939 Code. Roger contends that he was individually engaged in a trade or business, namely that of the partnership, by reason of being a partner. Dwight A. Ward, 20 T.C. 332, 343; Harding v. United States, 113 Fed. Supp. 461, 463. It is assumed, arguendo, that this contention is correct. It is assumed, arguendo, also, that in 1948, Roger sustained a net operating loss of $3,068.11. That amount results from, in part, payment in 1948 by Roger of $3,636.66 to a bank as a guarantor of a note of Idlewild. The narrow question to be decided is whether a loss of $3,068.11, is deductible in 1947. Respondent contends, inter alia, that Roger has failed to comply with the requirements of *282 section 122(b)(1)(A), in computing the amount of a deduction under section 23(s). Respondent cites Regulations 111, section 29.122-4(b). The deduction in 1947 of $3,068.11 is disallowed. The applicable provisions of section 122(b) require that the 1948 operating loss first must be carried back to the two preceding years 1946 and 1947. It was necessary for the petitioner, Roger, to establish the amount of his adjusted net income for 1946, which he has failed to do, so as to compute the excess of the 1948 net operating loss, if any, over and above Roger's adjusted net income for 1946. "The net operating loss, to the extent it exceeds the net income, if any * * *, for the second preceding taxable year, may then be carried back to the first preceding taxable year." Regulations 111, section 29.122-4(b). We do not know whether the 1948 net operating loss of $3,068.11 was absorbed, in whole or in part, by Roger's adjusted net income for 1946, so as to leave any of the 1948 loss available as a carry-back to the taxable year 1947. Issues 3 and 4: - Claims for reductions in gross receipts of International. In computing the gross receipts of International for its fiscal year ended June 30, 1947, *283 for the purpose of reporting income in the partnership return, petitioners reduced gross sales by $6,200, the amount of a so-called "reserve for sales refunds" which was entered on the books as of June 30, 1947. Respondent restored $6,200 to the amount of gross receipts from sales for the fiscal year. One question to be decided under this issue is whether the partnership is required to report income for the fiscal year ended in 1947 according to the system which had been followed prior to the setting up of the so-called reserve account on June 30, 1947. Another question is whether the partnership had actual liabilities as of June 30, 1947, obligating it to make refunds to its vendees in the amount of $6,200. Respondent contends, inter alia, that the creation of the so-called reserve account and the debiting of $6,200 thereto on June 30, 1947 involves, and represents, a change in the partnership's method of accounting without first obtaining the Commissioner's consent. The pleadings in the petitions raise a new issue by which a claim is made for the first time to the effect that the partnership is entitled to make some other adjustments in the amount of gross receipts from sales for *284 the 1947 fiscal year, in the amount for cost of goods sold in the 1947 fiscal year, and in gross profits from sales. These several adjustments result in a claim for reduction in gross receipts and net income in the amount of $6,679.05 for the 1947 fiscal year. The reason, briefly, for this claim is that at the end of the fiscal year, goods sold during the fiscal period and forwarded to donees of the petitioners' vendees (customers) were either in transit or had not yet been acknowledged by the donees. Petitioners argue that income from merchandise sold during the last 10 weeks of the fiscal year had not in fact accrued because there existed the possibility of the making of claims for refunds of the purchase price of such packages in the event there was nondelivery. Since the above-described issue, raised in the petitions, is related to the question of whether the gross receipts from sales properly can be reduced by $6,200, the two issues are considered together, as a matter of convenience. Before considering each issue on its merits, it is necessary to make observations about the way in which International's business was conducted during, before, and after the fiscal year ended in *285 1947. International carried on a business that had essentially two facets; that of selling merchandise at its place of business in New York City to purchasers, its vendees, for cash, and that of delivering the merchandise purchased to the donees of International's vendees living abroad. The transactions were simple. They are described here because petitioners have advanced a complex and elaborate theory about International's business relative to their contentions. Typical of all transactions of International in the fiscal year is the following: A customer, in every instance, was required to pay the entire amount, in cash or by check, for an order of merchandise. No credit was extended to any customer. International undertook to make shipment, of each parcel of merchandise purchased and paid for by a customer, to a donee of the customer living outside the United States. The vendee of the partnership made the request to have a package forwarded to some individual. There were shipping or forwarding charges, of course, but such charges were included in the total cost of a package of merchandise which was charged to and paid by the vendee in New York. Accordingly, the cash payment received *286 in every instance by International was for the sales price of the merchandise making up a package, plus the shipping and forwarding charges. The cash payments were recorded in order books and a receipt was given to International's vendees. The order books contained 25 or 50 order blanks. As the order books were filled, the totals of cash received were entered by Erica in the cash receipts book under the heading "sales." Each month these entries were totaled and the totals were entered in the general ledger as credits in the sales account. Such entries were made by International's accountant. During the taxable year, the total amount of International's cash sales, entered in its books, amounted to $192,399.38. In its advertisements and form letters, as set out in the Findings of Fact, International indicated that it would make cash refunds to its vendees or replace merchandise, if a parcel failed to be received by the donees of International's vendees. There is evidence to the effect that International's employees were instructed to inform all customers of this arrangement. During the taxable year, International actually made cash refunds to vendees in the sum of $3,858.83. There is *287 no evidence of the number of duplicate shipments made to replace undelivered parcels. The cash refunds were entered in the cash disbursements book. The monthly totals of these refunds were debited directly to the sales account in the general ledger. International's accountant, at the end of the 1947 fiscal year, suggested to the petitioners that they open an account on International's books as a reserve for refunds which might be made if vendees asked for refunds. Petitioners agreed. On June 30, 1947, the accountant opened a new account in International's books entitled, "Reserve for Sales Refunds." This account was credited in the amount of $6,200, and the sales account was debited. When International's books were closed for the 1947 fiscal year, its accountant treated the cash refunds, $3,858.83, and the reserve for sales refunds, $6,200, or a total of $10,058.83, as a total charge against gross receipts from sales, $192,399.38, so that the books showed receipts from sales for the 1947 fiscal year in a net amount of $182,340.55, and the amount which was reported in the partnership return for gross receipts from sales was $182,340.55. International's expenses during the fiscal year *288 for cost of merchandise sold to customers, shipping costs, supplies, employees' wages, and other labor costs amounted to $142,731.22. Cash was expended in the foregoing amount during the 1947 fiscal year for the above-stated purposes. In the partnership return of International for the 1947 fiscal year, accordingly, gross receipts from business were reported as $182,340.55; cost of goods sold, as $142,731.22, and gross profit as $39,609.33. With respect to the reduction of International's gross receipts in the amount of $6,200, petitioners contend that this amount represented actual liabilities of the partnership, to make refunds, as of June 30, 1947. With respect to the reduction of gross profit in the amount of $6,679.05, petitioners contend that the partnership's sales made in the last 10 weeks before the end of the fiscal year are not completed until delivery is made to the donees, and, therefore, that they are not to be taken into account as gross income until the succeeding fiscal year. We cannot agree with either contention. As we see the matter, petitioners' effort to reduce International's gross receipts and gross income involves postponing the reporting of income received *289 in the partnership's fiscal year of 1947, and we shall first deal with the issues in that light. Section 41, 1939 Code, [1] *290 provides that income shall be computed on the basis of an annual accounting period in accordance with the accounting method regularly employed by the taxpayer. There is no requirement that a taxpayer choose a particular accounting method, provided that the method chosen clearly reflects the income of the taxpayer. Ribbon Cliff Fruit Co., 12 B.T.A. 13. Section 42(a) [2] provides that all items of gross income shall be included in the gross income for the taxable year for which received by the taxpayer unless some amounts of gross income may properly be accounted for as of a different taxable period. It is well settled that a taxpayer who derives a profit without any restriction as to its disposition has received income which must be reported in the taxable period in which it is received. North American Oil Consolidated v. Burnet, 286 U.S. 417; Blum v. Helvering, 74 Fed. (2d) 482, affirming 27 B.T.A. 1033. Petitioners did not treat the proceeds from sales made in the last 10 weeks of the partnership fiscal year as funds with restrictions attached thereto. Receipts from all sales were deposited directly into the single bank account International maintained, with the exception of minor amounts kept on hand to facilitate making change for customers. All receipts were commingled. No restrictions were placed on the use of the funds in the bank account and they were, in fact, used *291 to meet the normal operating expenses of International's business. There was no segregation of cash receipts for sales in which delivery to the donees of International's vendees had not yet been completed. It is our opinion that the adjustments which International might have to make after the end of any fiscal year, if parcels were not received by the donees of the partnership's vendees, essentially are not different from the usual adjustments which any mercantile business has to make in the course of a year if merchandise is returned or is unsatisfactory, resulting in the making of refunds. The proper treatment of such cash refunds is to take deductions for the amounts thereof in the taxable period in which they are made. In the recent case of Josef C. Patchen, 27 T.C. - (Dec. 21, 1956), we dealt, inter alia, with a similar problem. In that case, petitioners were members of a partnership engaged in professional engineering. Its books and records were kept on an accrual basis; therefore, amounts billed to clients were recorded on its books as income even though payment was not made. In some instances, the partnership had to make adjustments in the amounts billed due to disputes with *292 clients. Petitioners contended that the billings that were subject to adjustments should not be included in their income for the taxable year in which the amount billed had accrued until all possible adjustments were made. In holding for the respondent, we said, "Under our system of annual accounting for income tax purposes, the partnership could not postpone the reporting of accrued items of income solely because there was a possibility that adjustments might, in some instances, have to be made in a later year. See Spring City Foundry Co. v. Commissioner, 292 U.S. 182. " With reference to the so-called reserve account, petitioners contend that the amount of $6,200 represents claims from customers made by them and conceded by International in this amount. They allege that International reported income and kept its books on an accrual basis, and is, therefore, allowed to deduct such allegedly fixed and definite claims. We are of the opinion, however, that the amount of $6,200 represents a reserve for contingent claims which were not fixed and definite. During the partnership's 1947 fiscal year, International made cash refunds in the amount of $3,858.83. There is no evidence that any *293 other claims were made by customers and conceded by the partnership during its 1949 fiscal year. We are not told how many missing parcels this amount of $6,200 represents, nor how many vendees or donees were involved. The petitioners have introduced no documentary evidence which substantiates the reduction in gross receipts of $6,200. The books of the partnership shed no light on the subject. All testimony as to the amount of this so-called reserve revolved around International's alleged claims against its forwarders, an item which would be an account receivable, rather than an account payable. There is no evidence dealing directly with these alleged claims of International. None of these claims of International against its forwarders were ever paid to International. The record indicates and we can only conclude that the so-called reserve of $6,200 was based on an estimate of possible future claims for refunds. In the next succeeding fiscal year of the partnership, ended June 30, 1948, only $1,712.53 was refunded to customers; and in the short fiscal period ended January 31, 1949, only $30.25 was refunded to customers. Finally, during the period ended January 31, 1949, the so-called *294 reserve account was reduced by $3,087.47 and income was credited with this amount. These were adjusting entries which indicate that alleged claims against the partnership were not enforceable claims, were not accepted by the partnership, and probably, if actually made against the partnership, were abandoned. The record does not explain why the adjusting entry of $3,087.47 was made in 1949. In the absence of proof as to the amount of any fixed and definite claims conceded to be owing by the partnership, respondent's determination must be sustained. The Internal Revenue Code makes specific provision for certain reserves, such as reserve for bad debts, and provides how such special reserves may be treated for tax purposes. Other reserves may only be deducted in the year when they represent fixed and definite liabilities which have been incurred. Brown v. Helvering, 291 U.S. 193; Pacific Vegetable Oil Co., 26 T.C. 1, (Issue 1) (on appeal C.A. 9); Farmville Oil Fertilizer Co., 30 B.T.A. 1048 affd. 78 Fed. (2d) 83. In Farmville Oil Fertilizer Co., supra, we said, "That a reserve for inactive contingencies such as possible repayments, price discounts, or price rebates, the amounts *295 of which have not been fixed or are not fairly susceptible of ascertainment prior to the end of the taxable year in question, is not the basis of a statutory deduction has now become a settled doctrine. Brown v. Helvering, 291 U.S. 183 [193]." Respondent contends that petitioners' effort to reduce International's gross receipts by $6,200, and gross income by $6,679.05, is, in effect, an attempt to change the partnership's method of accounting without first obtaining the Commissioner's consent. Section 29.41-2 of Regulations 111 expressly provides that the consent of the Commissioner must be obtained before a taxpayer can change his method of accounting. As respondent clearly points out, International did not make any request to the Commissioner for permission to make any change in its method of accounting, and no such permission was given. International has always made its sales of merchandise, kept its records of sales and reported its gross receipts on a cash basis. Orders were not filled until cash was received. Most of International's business was done "over the counter" at its place of business in New York City. International made no credit sales, nor did its books contain accounts *296 for accounts receivable or for goods in transit. International recorded its sales as they were made and the cash therefor was received. Its sales were made to purchasers in the United States, not to their donees located abroad. To allow a decrease in gross profit in the amount of $6,679.05 for the fiscal year ended June 30, 1947, would be to permit International to change its accounting method. Without the Commissioner's permission having been requested pursuant to the regulation, we cannot allow the partnership to make the contemplated change in its method of accounting. Ross B. Hammond, Inc., 36 B.T.A. 497 affd. 97 Fed. (2d) 545; Estate of L. W. Mallory, 44 B.T.A. 249; Claude Patterson Noble, 7 T.C. 960; Shoong Inv. Co. v. Anglim, 45 Fed. Supp. 711; Advertisers Exchange, Inc., 25 T.C. 1086. This Court cannot approve the attempt of petitioners to ignore the respondent's regulation. The facts also show that all refund claims settled by International by means of cash refunds did not appear on the books of the partnership until such cash refunds were made. During the partnership's 1946 and 1947 fiscal years, all cash refunds were recorded initially in the cash disbursements book, *297 and then posted directly to the sales account as debits. The petitioners do not claim, and the evidence does not show, that, in 1945, 1946, and 1947, prior to the creation of the so-called reserve account, any claims for refunds were first recorded on the books of the partnership in the account entitled "Accrued Liabilities and Sundry Payables," or in any other similar account. The accrual of $6,200 in the so-called reserve for sales refunds account, assuming arguendo that there were fixed and definite liabilities in that amount as of June 30, 1947, which, however, is not established, constituted a change in accounting method. Such changes in accounting methods are not permitted for income tax purposes without the prior permission of the Commissioner. Ross B. Hammond, Inc., supra. In view of the conclusions we have reached, it is not necessary to discuss other contentions of the petitioners relating to the claimed reductions in gross receipts and gross profits. Consideration has been given to all of the arguments of petitioners and respondent. It is sufficient to conclude, and it is held, that the partnership's consistently followed method of accounting which did not involve a so-called *298 reserve for refunds, or any deferment of reporting income from all cash payments for merchandise, received in a fiscal year, clearly reflected the partnership's income. It is held that respondent correctly increased the partnership's gross receipts by $6,200. It is held, further, that the petitioners are not entitled to a reduction in the gross profits of the partnership in the amount of $6,679.05. Decisions will be entered for the respondent. Footnotes
1. SEC. 41. GENERAL RULE. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * * 2. SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED. (a) General Rule. - The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. * * *↩